FIRST BANK OF SOUTH DAKOTA (National Association, Aberdeen, South Dakota, a banking corporation, Plaintiff and Appellee,

v.

HABERER DAIRY & FARM EQUIPMENT, INC., a corporation, Carney Haberer, Edwin Van Meter, and Mildred Van Meter, Defendants,

and

Merle D. Haberer and Florence Haberer, Defendants and Appellants.

FIRST BANK OF SOUTH DAKOTA (National Association, Aberdeen, South Dakota, a banking corporation, Plaintiff and Appellee,

v.

HABERER DAIRY & FARM EQUIPMENT, INC., a corporation, and Carney Haberer, Defendants,

and

Edwin Van Meter and Mildred Van Meter, Defendants and Appellants,

and

Merle D. Haberer and Florence Haberer, Defendants and Appellants.

Nos. 15356, 15512 and 15513.

Supreme Court of South Dakota.

Argued April 21, 1987.

Decided Sept. 16, 1987.

Carlyle E. Richards of Carlyle E. Richards, P.C., Aberdeen, for plaintiff and appellee First Bank.

H.I. King, III of Tonner & Tobin, Aberdeen, for defendants and appellants Haberers.

Peter J. Pagones and Rory King of Siegel, Barnett & Schutz, Aberdeen, for defendants and appellants Van Meters.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES

Plaintiff-appellee, First Bank of South Dakota (Bank), loaned $125,000.00 to Haberer Dairy & Farm Equipment, Incorporated (Haberer Dairy). A promissory note was executed and Bank received a security interest in Haberer Dairy equipment assets, certain property of the Haberer family and two certificates of deposit held by Edwin and Mildred Van Meter, defendants-appellants (Van Meters). Upon default, Bank sued based upon the debt and was awarded a judgment of $141,555.33 and the right to dispose of collateral as per SDCL ch. 57A–9. Following both private and auction sales, Bank moved for an order approving the return of sale and also requested a deficiency judgment. Defendants objected. The circuit court found in favor of Bank, ruling that the disposal of personal property was commercially reasonable and awarded a deficiency judgment of $80,-865.60. Merle and Florence Haberer and Van Meters (Defendants) contend the circuit court reached a faulty decision and collectively raise ten areas of alleged circuit court error. We have identified five main issues which are dispositive of this appeal.

(1) Did Bank elect strict foreclosure to the exclusion of all other remedies?
(2) Does execution of the Bill of Sale bar any deficiency judgment?
(3) Did Bank conduct sales in a commercially unreasonable manner?
(4) Is Bank entitled to a deficiency judgment if collateral remains unsold?
(5) Should Bank receive attorney fees for expenses relating to default?

We affirm in part, reverse in part, and remand in part. Defendants also claim there was error in computing the deficiency. Bank, in its brief, offers its cooperation in retabulating same. In our remand, we also direct the circuit court to focus its attention to this matter.

## FACTS

On August 12, 1983, Bank loaned Haberer Dairy $125,000.00. A promissory note was executed, and Bank also received an extensive security interest in Haberer Dairy's present and prospective business properties and assets. Earlier, on July 21, 1983, Van Meters, friends and past customers of Haberer Dairy, executed a security agreement granting Bank an interest in two certificates of deposit[1] in exchange for the impending loan to Haberer Dairy. Van Meters, on July 29, 1983, then signed a personal guaranty which guaranteed payment of the August 12, 1983 promissory note by Haberer Dairy. The $125,000.00 promissory note came due on December 1, 1983, 111 days after issuance.

With the exception of one interest payment of $2,000.00, Haberer Dairy failed to make any payments on the note. By Summons and Complaint, Bank sued Haberer Dairy and Van Meters based upon (1) Haberer Dairy's promissory note and security agreement; and (2) Van Meters' personal guaranty and security agreement relating to certificates of deposit. On July 19, 1984, following a hearing the day before, Bank was awarded Judgment of $141,555.33 against Haberer Dairy, Merle, Florence,

---

1. Each of two certificates of deposit had a face amount of $20,000.00.

and Carney Haberer, and Van Meters.[2] The court ruled Bank was entitled to immediate possession of all Haberer Dairy properties listed in the security agreement, and as per SDCL ch. 57A–9, to dispose of the property. Bank received similar rights as to Merle Haberer's 1974 Oldsmobile automobile, tract of land in Brown County, South Dakota, and Haberer Dairy's interest in a certain contract for deed. Van Meter's interest in the two certificates of deposit was also foreclosed and Bank was permitted to liquidate the certificates and apply the cash proceeds to payment of its Judgment.

Alan Wehrenberg, of Bank, testified that Bank attempted to secure possession of collateral but was frustrated by Haberer Dairy. Also, Bank reportedly granted additional time to enable Haberer Dairy to satisfy the debt. Thereafter, on September 24, 1984, Haberer Dairy executed a Bill of Sale, transferring ownership of essentially all collateral specified in the security agreement to Bank.[3] Bank contends it accepted this Bill of Sale to finally obtain possession of the collateral, which event would occur on November 5, 1985. According to Bank, the Bill of Sale was offered by Haberer Dairy in exchange for Bank's promise to delay attempts, for sixty days, to sell the collateral, as Haberer Dairy sought more time to satisfy the judgment. In a letter dated October 11, 1984, attorney for Bank informed attorney for Haberer Dairy and Van Meters that (1) on or after November 5, 1984 (after expiration of the sixty-day grace period) private sales will be arranged to sell all personal property; (2) costs of collection will be deducted from net proceeds realized at the sale; (3) the Bill of Sale is not accepted in full satisfaction of the debt; and (4) Haberer Dairy or Van Meters may redeem the collateral prior to November 5, 1984 or the date Bank has contracted to sell the secured property. Also, in September 1984, Bank engaged Bill Huey of Universal Liquidators to appraise the collateral. Huey's appraisal figure was $136,850.00 if the plant was sold as a complete package.

As of November 5, 1984, the collateral remained in Haberer Dairy's possession. On December 3, 1984, Huey completed a second appraisal which, due to declining market prices, listed the fair market value of the collateral as $62,370.00.[4] In the last week of December 1984, Merle Haberer informed Bank he had arranged to sell the plant as a package, but the prospective buyer would not be able to arrange financing until January 2, 1985. In February 1985, Bank leased, for $1,000.00 per month, the building in which Haberer Dairy's equipment was located, thereby obtaining possession of the collateral. Bank proceeded to sell, through private sales, some small items to interested individuals and applied the $2,845.00 received to the judgment.[5] At this juncture, Merle Haberer notified Bank that Wheaton Development Corporation of Minnesota was interested in the plant. According to Bank, Wheaton requested forty-five days to arrange financing. Thereafter, Bank requested Wheaton pay the $1,000.00 a month lease cost on the building, which Wheaton paid for the month of May 1985. No further lease payments were received from Wheaton and Bank prepared to conduct an auction sale of the collateral.[6]

---

2. The total award was structured as follows:

| $125,000.00 | promissory note |
|---|---|
| 14,883.55 | interest |
| 1,582.50 | attorney's fees |
| 89.28 | court costs and statutory fees |
| $141,555.33 | |

3. The stated consideration for which Haberer Dairy executed the Bill of Sale was "the sum of One Dollar and other good and valuable consideration...."

4. Haberer Dairy produced a witness who testified that market conditions had not declined to the point described by Bill Huey.

5. Bank sold two welders, a pipe threading machine, small miscellaneous items, two file cabinets, and some wire to the Blumengard Hutterite Colony.

6. Bank claims Wheaton lost interest in the venture. Conversely, Merle Haberer testified Bank refused to sell the plant to Wheaton. Unfortunately, the record is unclear as to which story is correct.

Bank retained an auctioneer who inspected all collateral and printed 640 sale bills. Huey, of Universal Liquidators, mailed 100 sale bills and Bank testified it distributed the remaining sale bills except for approximately twenty-five. Huey also testified that he had earlier advertised the equipment in the *Industrial Trader* and sent fifty letters to persons who had previously bid on heavy equipment.

On July 22, 1985, written notice of the auction sale, scheduled for August 1, 1985, was sent by mail, return receipt requested, to Merle, Florence and Carney Haberer, Edwin and Mildred Van Meter. Forty-seven persons registered to bid at the sale and gross receipts totaled $26,117.00. Three vehicles were also sold (1975 Chrysler Newport, 1974 Ford pickup, 1965 Pontiac Catalina) for $50.00 each.

On November 14, 1985, Bank moved for an order approving the return of sale. Haberer Dairy and Van Meters objected. A series of hearings were held before the Honorable Eugene Dobberpuhl in Aberdeen, South Dakota. On March 12, 1986, the court concluded, in its Memorandum Decision, that the auction sale was conducted in a commercially reasonable manner. Findings of Fact and Conclusions of Law were entered on August 6, 1986. Bank was found to be entitled to a deficiency judgment against Haberer Dairy (including Merle, Florence, and Carney Haberer) and Van Meters, jointly and severally, in the amount of $80,865.60, plus interest. Merle and Florence Haberer, and Van Meters filed separate appeals which were consolidated for presentation before this Court.

DECISION

I.

◼ Defendants contend Bank elected strict foreclosure thus barring its right to pursue further remedies.[7] Defendants further theorize that Bank, through its strict foreclosure choice, relinquished any claim to a deficiency judgment. We agree that a creditor's election of strict foreclosure prevents obtainment of a deficiency judgment. SDCL 57A-9-505(2). However, in this case, Bank did not choose strict foreclosure.

The Uniform Commercial Code (UCC) eliminates ante-Code doctrine which required a secured party to make an election of remedies. *Bilar, Inc. v. Sherman,* 40 Colo.App. 38, 40-42, 572 P.2d 489, 491-92 (1977). *See Michigan Nat'l Bank v. Marston,* 29 Mich.App. 99, 103-04, 185 N.W.2d 47, 49 (1970). *See generally* W. Davenport & D. Murray, *Secured Transactions* § 6.01(a), at 257-58 (1978). The Code specifies that a secured party's "rights and remedies ... are cumulative." SDCL 57A-9-501(1). Three basic remedies appear in the Code. A secured party may

(1) sell or otherwise dispose of the collateral (SDCL 57A-9-504);

(2) retain the collateral in discharge of the obligation—strict foreclosure (SDCL 57A-9-505(2));

(3) allow a debtor to retain the collateral and sue on the debt (SDCL 57A-9-501(5)).

J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 26-1, at 1084-85 (2d ed. 1980). While a secured party is not permitted under the Code to extract a profit at the debtor's expense, implementation of one remedy does not limit pursuit of other remedies. *See Central Acceptance Corp. v. Colonial Bank,* 439 So.2d 144, 148 (Ala. 1983); *Snake River Equip. Co. v. Christensen,* 107 Idaho 541, 544, 691 P.2d 787, 790 (1984); *Bilar,* 40 Colo.App. at 40-42, 572 P.2d at 491-92; *Michigan Nat'l Bank,*

---

7. "Strict foreclosure," a phrase traditionally used in real property transactions, has evoked the following interpretation when used in the medium of the Uniform Commercial Code.

Upon default and repossession, the secured creditor may wish to avoid the headache of resale and therefore accept the collateral in complete satisfaction of the debt under 9-505(2) [SDCL 57A-9-505(2) ]. By so doing he foregoes any right to a deficiency. This alternative of "strict foreclosure" was known to the common law and was available under the Uniform Conditional Sales Act. (Footnote omitted.)

J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 26-8, 1104-05 (2d ed. 1980).

29 Mich.App. at 103–04, 185 N.W.2d at 49; *Olsen v. Valley Nat'l Bank*, 91 Ill.App.2d 365, 369–72, 234 N.E.2d 547, 550–51 (1968).

■ In this case, the record does not support Defendants' contention that Bank elected the remedy of strict foreclosure. Instead, Bank availed itself of the remaining two remedies contained in the Code. It sued on the debt (SDCL 57A–9–501(5)) and attempted to sell the collateral (SDCL 57A–9–504). We note that remedies available to a creditor are cumulative unless inconsistently used. *See* SDCL 57A–9–501(1). A basic tenet of the Code states: "The remedies provided by this title shall be *liberally administered* to the end that the aggrieved party may be put in as good a position as if the other party had *fully performed....*" SDCL 57A–1–106(1) (emphasis supplied). *See* J. White & R. Summers, *supra* § 4, at 16. A further indication that strict foreclosure was not chosen is that Bank never sent written notice to debtors informing them of its intention to retain collateral in satisfaction of the debt as required by SDCL 57A–9–505(2). To the contrary, Bank, by letter, specifically expressed that it did not accept the collateral in full satisfaction of the debt. Therefore, Defendants' assertions that Bank elected strict foreclosure must fail.

## II.

■ Defendants also advocate the execution of a Bill of Sale bars any deficiency judgment. Defendants elaborate stating essentially, acceptance of the Bill of Sale, by Bank, (1) is the equivalent of Bank's election of strict foreclosure as a remedy; and (2) acts to obviate the written notice requirement of SDCL 57A–9–505(2). Defendants further argue Bank, upon acceptance of the Bill of Sale, severed the debtor-creditor relationship between the parties. We are unpersuaded by these arguments.

Although the parties disagree regarding which of them recommended use of the Bill of Sale, all agree its primary role was to give Haberer Dairy more time to secure financing or find a buyer for the plant. Indeed, by the very terms of the Bill, Bank received all the collateral and Haberer

Dairy received "One Dollar *and other good and valuable consideration....*" (Emphasis added.) It is undisputed that Haberer Dairy retained possession of the collateral before, during and for a period of approximately four months after execution of the Bill of Sale. It is also undisputed that Bank, in July of 1984, was awarded a judgment which specified it was entitled to immediate possession of collateral.

Clearly, the Bill of Sale accomplished nothing except extend Haberer Dairy's time to locate capital and pay off the judgment against it. *See Michigan Nat'l Bank*, 29 Mich.App. at 107–08, 185 N.W.2d at 51. In *Michigan Nat'l Bank*, the court stated "the fact that [creditor] held title did not result in an election of remedies." *Id.* "The [creditor] held title in only the narrowest sense of the word and neither had physical control ... nor indicated an intention to exercise its right of retention of the collateral." *Id.* We accordingly hold that execution of the Bill of Sale does not bar Bank's deficiency judgment.

## III.

Defendants next contend sales made by Bank in February and March 1985 (private sales) and August 1, 1985 (auction sale) were conducted in a commercially unreasonable manner. Collectively, Defendants advance three theories to support this statement. First, Plaintiff excessively delayed in disposing of the collateral which resulted in a low return on sale. Second, the auction itself was improperly conducted and insufficiently advertised so as to constitute a commercially unreasonable sale. Third, Plaintiff failed to give Defendants notice of the private sales to the Blumengard Hutterite Colony. We are unmoved by Defendants' first two contentions but find their third argument persuasive.

(a) Bank was not guilty of excessive delay.

■ Generally, when a creditor sues for a deficiency, he bears the burden of proving that disposition of the collateral was conducted in compliance with the Uniform Commercial Code. *Clark Leasing Corp. v. White Sands Forest Prod., Inc.*, 87 N.M.

451, 454, 535 P.2d 1077, 1080 (1975) (interpreting U.C.C. 9–504(3) which parallels SDCL 57A–9–504(3)); J. White & R. Summers, *supra* § 26–9, at 1109. *See Farmers State Bank v. Otten*, 87 S.D. 161, 165–66, 204 N.W.2d 178, 180 (1973); R. Henson, *Handbook on Secured Transactions Under the Uniform Commercial Code* § 10–10, at 368 (2d ed. 1979). "Secured parties who have been laggard in their disposition have been held to have accepted the collateral—however unintentionally—in satisfaction of the obligation, or have been found liable in damages when circumstances indicated that a prompt disposition would have produced a surplus." W. Davenport & D. Murray, *supra* § 6.05(b)(2), at 275 (footnotes omitted).

■ We fail to comprehend how Bank has been "laggard" in its disposition of the collateral. On the contrary, the settled record reflects that Bank used patience and flexibility to attempt to arrive at a disposition congenial to all parties. We recall (1) Defendants repeatedly requested more time to find a suitable buyer for the plant; (2) Bank did not obtain possession of the collateral until February 1985; (3) Bank sold individual pieces of collateral via private sales in February and March 1985; (4) Wheaton Development Corporation was a prospective buyer and paid the May 1985 lease amount; and (5) on August 1, 1985, an auction sale was held.

We have long adhered to the legal principle that credibility of witnesses, and weight accorded their testimony and weight of evidence is for the trial court to decide. *Scott v. Wagner*, 274 N.W.2d 266 (S.D.1979). This Court has also followed the rule that a reviewing court is not at liberty to alter findings where the trial court has resolved conflicts in the evidence. *Mulder v. Tague*, 85 S.D. 544, 186 N.W.2d 884 (1971). Further, we have held that if there is sufficient evidence in the record to support the trial court's factual decision, the reviewing court will not disturb that decision. *McLaughlin Elec. Supply v. American Empire Ins.*, 269 N.W.2d 766 (S.D.1978); *City of Rapid City v. Hoogterp*, 85 S.D. 176, 179 N.W.2d 15 (1970). *See* SDCL 15–6–52(a).

The circuit court, following extensive hearings on plaintiff's motion for confirmation of sale, in its March 12, 1986 Memorandum Decision, observed: "During the interval between the bill of sale and the auction, testimony established to the Court's satisfaction that the bank walked not only an extra mile, but probably about ten extra miles, in trying to dispose of this property in a manner that was most satisfactory to the defendants...." In its Findings of Fact and Conclusions of Law, the court wrote: "That every aspect of the disposition of the personal property ... including the method, manner, time, place and terms of the sale of said personal property, was commercially reasonable within the meaning of SDCL 57A–9–504(3) as amended." As there is sufficient evidence supporting the circuit court's determination, this Court will not disturb it.

(b) The auction sale was commercially reasonable.

■ "Many courts agree with the approach used in *In re Zsa Zsa Limited,* where 'it is the aggregate of circumstances in each case—rather than specific details of the sale taken in isolation—that should be emphasized in a review of the sale. The facets of manner, method, time, place, and terms cited by the Code are to be viewed as necessary, and interrelated parts of the whole transaction.' " Rudow, *Determining the Commercial Reasonableness of the Sale of Repossessed Collateral,* 19 U.C.C.L.J. 139, 140 (1986) (footnotes omitted) (quoting *In re Zsa Zsa Ltd.,* 352 F.Supp. 665, 670 (S.D.N.Y.1972), *affirmed,* 475 F.2d 1393 (2d Cir.1973)). A leading Code commentator has identified distinguishing characteristics of a commercially reasonable auction sale, which are rearranged in checklist fashion.

1. "[A] sale at which the public, particularly including the knowledgeable trade public, is invited, by prior advertisement, to appear and bid for the collateral to be sold.

2. If the collateral is goods, they should be available for inspection by prospective bidders before the sale.

3. The advertisement should be published in at least one newspaper of general circulation, and perhaps appropriate trade publications, reasonably in advance of the time of sale to allow potential bidders to participate, and should provide a reasonable amount of information concerning the time and place of sale and the collateral to be sold.

4. The goods must be offered and sold for cash to the highest responsible bidder; and bidders must know of other bids and be permitted to raise their bids.

5. The place of sale, moreover, must be accessible to the general public; and the sale itself, if not conducted by one of the parties or a public official, must generally be under the direction of a licensed auctioneer."

W. Davenport & D. Murray, *supra* § 6.05(b)(2), at 273–74 (footnotes omitted). A review of the settled record indicates:

1. Over 600 sale bills were printed and distributed, 100 of which were sent by Mr. Huey to dealers in Denver, Montana, Omaha, and Lincoln who might be interested in such equipment.

2. Prospective bidders were apparently free to examine the collateral before bidding.

3. Advertisement of the auction sale appeared in the *Missouri Basin Shopper, Sioux Falls Argus Leader,* and *Aberdeen American News.*

4. The record reflects the auction was conducted in the usual manner, with bids made aloud to give opportunity to competing bidders to raise their bids.

5. Location of sale appeared easily accessible and directions thereto were included in newspaper advertisements and sale bills. The sale was conducted by an auctioneer licensed in South Dakota.

As earlier noted, the circuit court found the auction was conducted in a commercially reasonable manner within the meaning of SDCL 57A-9-504(3). A trial court's finding that a sale is "commercially reasonable" is a finding of fact, *C.I.T. Corp. v. Duncan Grading & Constr., Inc.,* 739 F.2d 359, 360 (8th Cir.1984) (per curiam); *Lendal Leasing v. Farmer's Wayside Stores,* 720 S.W.2d 376, 380 (Mo.Ct.App.1986), which will be upheld unless it is clearly erroneous. *C.I.T.,* 739 F.2d at 360. Review of the settled record in this case convinces us that there is ample support for the circuit court's determination. Therefore, the circuit court's ruling that the auction sale was commercially reasonable is not clearly erroneous.

(c) Did Bank give Defendants reasonable notification of private sales?

The record in the present case reflects that Bank, by letter dated October 11, 1984, advised Defendants' counsel of its intention to dispose of collateral, through private sales, commencing after November 5, 1984. Defendants' counsel admitted to receipt of this letter. Defendants Van Meters contend Bank failed to comply with notice requirements set forth in the Code. For reasons detailed below, we remand this matter to the circuit court for resolution.

SDCL 57A-1-201(26) provides that a person gives notice to another "by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it." Further, a person may receive notice when it comes to his attention or when "[i]t is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications." *Id.* Indeed, the real issue in these cases is not whether a debtor received notice, but if a creditor, in view of all the facts and circumstances of each case, took reasonable steps to give notice to the debtor. *See Chemlease Worldwide, Inc. v. Brace, Inc.,* 338 N.W.2d 428, 434–35 (Minn. 1983); *Citizens State Bank v. Sparks,* 202 Neb. 661, 662–64, 276 N.W.2d 661, 663 (1979); *First Nat'l Bank v. Rose,* 197 Neb. 392, 395–98, 249 N.W.2d 723, 725–26 (1977); *Steelman v. Assocs. Discount Corp.,* 121 Ga.App. 649, 175 S.E.2d 62 (1970).

We note that a creditor intending to sell collateral at private sale must send *"reasonable notification* [to the debtor] of the time after which any private sale ... is to be made...."* SDCL 57A-9-504(3) (emphasis added). The term "reasonable notification" is not defined in the Code, but "courts have consistently treated the uniform commercial code requirement of *reasonable notification* as a question of fact to be determined only after considering all the facts and circumstances of the individual case." *Ridley v. First Nat'l Bank,* 87 N.M. 184, 187, 531 P.2d 607, 610 (N.M.App. 1974) (emphasis in original), *cert. denied,* 87 N.M. 179, 531 P.2d 602 (1975). *See Baber v. Williams Ford Co.,* 239 Ark. 1054, 396 S.W.2d 302 (1965); 69 Am.Jur.2d *Secured Transactions* § 615, at 519 (1973). Moreover, a creditor's recovery of a deficiency judgment, *inter alia,* may be adversely affected by his failure to comply with default provisions of the Code. *See* 69 Am.Jur.2d *supra* § 616. *See generally* J. White & R. Summers, *supra* §§ 26-12 through 26-15.

In the case at hand, the circuit court, in Conclusion of Law 2, wrote: "[E]very aspect of the disposition of the personal property ... was commercially reasonable within the meaning of SDCL 57A-9-504(3)...." However, at various points during the confirmation of sale hearing, the court strongly indicated that it was only concerned with the commercial reasonableness of the *auction sale.* In addition, in its March 12, 1986 Memorandum Decision, the circuit court stated "that the sale on August 1, 1985 [auction sale] was done in a reasonably commercial manner, and that the sale should be confirmed." No mention of private sales was made in the court's Memorandum Decision. Although testimony was given regarding private sales, this issue was also never squarely addressed in the circuit court's Findings of Fact and Conclusions of Law.

Only in rare situations will an appellate court determine, as a matter of law, that reasonable notification occurred. *See, e.g., Steelman,* 121 Ga.App. at 650-51, 175 S.E.2d at 64. We are of the opinion that such a situation does not presently exist.

Due to the factually based nature of the inquiry currently before this Court, remand to the circuit court is warranted. The court is instructed to determine, in light of all the facts and circumstances of this case, whether Defendants Van Meters received reasonable notice of private sales as intended by the Code.

### IV.

Defendants advocate that the circuit court was incorrect in entering a deficiency judgment because certain collateral remains unsold. We agree with Defendants to the extent detailed below and remand this issue to the circuit court for resolution in accordance with our directions.

While the record is unclear on this point, it strongly indicates the following items of collateral have yet to be sold or otherwise disposed of:

(1) a pickup truck topper;

(2) a 1974 boat trailer #28627; and

(3) certain dairy equipment patents.

Additionally, Bank has not acted regarding a second mortgage on real estate in Bowdle, South Dakota.

The three basic Code remedies available to a secured party upon debtor's default were discussed earlier in this opinion. To recapitulate, a secured party may (1) sell or otherwise dispose of the collateral (SDCL 57A-9-504); (2) retain the collateral in discharge of the obligation—strict foreclosure (SDCL 57A-9-505(2)); (3) allow a debtor to retain the collateral and sue on the debt (SDCL 57A-9-501(5)). J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 26-1, at 1084-85. A creditor who fails to act according to one of these enumerated options is acting contrary to Code provisions and subjects himself to liability for the debtor's damages. *Otten,* 87 S.D. at 166, 204 N.W.2d at 180-81; *Chapman v. Field,* 124 Ariz. 100, 105, 602 P.2d 481, 486 (1979) *(en banc ).* As we expressed in *Otten,*

[i]t would be unfair to allow a creditor to deprive the debtor of the possession and use of the collateral for an unreasonable length of time and not apply the asset or

the proceeds from its sale toward liquidation of the debt. Moreover, it would be equally unfair to allow a creditor to take possession at all, if the creditor never intended to dispose of the security. For during the period that the debtor is deprived of possession he may have been able to make profitable use of the asset or may have gone to far greater lengths than the creditor to sell. Once a creditor has possession he must act in a commercially reasonable manner toward sale, lease, proposed retention where permissible, or other disposition. If such disposition is not feasible, the asset must be returned, still subject, of course, to the creditor's security interest. To the extent the creditor's inaction results in injury to the debtor, the debtor has a right of recovery.

87 S.D. at 166–67, 204 N.W.2d at 181 (quoting *Michigan Nat'l Bank v. Marston*, 29 Mich.App. 99, 108, 185 N.W.2d 47, 51 (1970)) (citations omitted).

Bank argues unconvincingly that the unsold personal property is either valueless or was not available for possession. If this is the case, Bank fails to explain its reasons for not relinquishing its hold on these items so Defendants can attempt sale or other disposition. Regarding the second mortgage on real estate, Bank asserts no action was taken to foreclose because it concluded the value of the real estate is less than the debt secured by the first mortgage. Again, if Bank has decided in this manner, it would be unfair to maintain control of the second mortgage *and* seek a deficiency judgment. Rather, Bank should have returned the collateral to Defendants. *See Otten*, 87 S.D. at 166–67, 204 N.W.2d at 180–81; *Chapman*, 124 Ariz. at 105, 602 P.2d at 486. We also note that the circuit court failed to treat the unliquidated collateral question in its Findings of Fact and Conclusions of Law.

Therefore, remand to the circuit court is required to discern if damages were incurred by Defendants as a result of Bank's failure to dispose of these items of collateral in a commercially reasonable manner. Damages, if any, should be subtracted from the total judgment. *See Otten*, 87

S.D. at 169–70, 204 N.W.2d at 182–83; *Chapman*, 124 Ariz. at 105, 602 P.2d at 486.

## V.

Defendants advocate that the circuit court erred in awarding attorney fees of $1,582.50 to Bank. We agree with Defendants and reverse that portion of the circuit court's decision awarding Bank attorney fees.

Our analysis includes examination of three statutes. SDCL 57A–9–504(1)(a) provides that a secured party, upon disposition of collateral, after default, may receive "[t]he reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred...." SDCL 15–17–10 recites: "Any provision contained in any note, bond, mortgage, or other evidence of debt for the payment of any attorney fee in case of default in payment or of proceedings had to collect such note, bond, or evidence of debt or to foreclose such mortgage is hereby declared to be against public policy and void." Lastly, SDCL 15–17–7 states: "The court may allow attorneys' fees as costs for or against any party to an action only in the cases if it is specifically provided by statute...." Bank argues that SDCL 57A–9–504(1)(a) expressly permits the award of attorney fees and therefore satisfies the "specifically provided by statute" language of SDCL 15–17–7. We disagree.

This Court has often held that attorney fees are not recoverable in South Dakota unless they are specifically authorized by statute. *Ofstad v. South Dakota Dep't of Transp.*, 387 N.W.2d 539, 540 (S.D.1986). Our adherence to SDCL 15–17–7 as the underlying theme regarding attorney fee awards should be unquestioned. " 'The authority to tax such costs should not be implied, but must rest upon a clear legislative grant of power to do so.' " *Lowe v. Steele Constr. Co.*, 368 N.W.2d 610, 615 (S.D.1985) (quoting *City of Aberdeen v.*

*Lutgen,* 273 N.W.2d 183, 185 (S.D.1979)). *See International Multifoods Corp. v. Mardian,* 379 N.W.2d 840, 844–45 (S.D. 1985).

The current question is almost identical to the one presented in *In re American Beef Packers, Inc. v. Northwestern Nat'l Bank,* 548 F.2d 246 (8th Cir.1977). In that case, the court of appeals was forced to reconcile section 9–504(1)(a) of the Nebraska Uniform Commercial Code (which paralleled SDCL 57A–9–504(1)(a)) with settled Nebraska law which denied attorney fees "unless it is permitted by statute or uniform practice and the statutes must be strictly construed." *American,* 548 F.2d at 247–48 (citing *Warren v. Warren,* 181 Neb. 436, 149 N.W.2d 44 (1967); *Morton v. Travelers Indem. Co.,* 171 Neb. 433, 106 N.W.2d 710 (1960)). The court in *American* denied attorney fees and noted that it "cannot envision such a sweeping change in the state law by such innocuous phraseology as is found in § 9–504(1)(a)." 548 F.2d at 248.[8]

While not dispositive of the issue in this case, we find the rationale employed by court of appeals in *American* highly persuasive. Settled South Dakota law must take precedence over the language of SDCL 57A–9–504(1)(a). Awards of attorney fees in these situations must await express legislative authorization.[9] The circuit court's award of attorney fees to Bank is reversed.

### Conclusion

In conclusion, we affirm the circuit court on Issues one and two. Regarding Issue three, in reference to Van Meters, we remand for resolution of whether Bank complied with the "reasonable notification" requirement of SDCL 57A–9–504(3). Concerning Issue four, we also remand directing the circuit court to discern if damages were incurred by Defendants resulting from Bank's failure to dispose of collateral in a commercially reasonable manner.

Lastly, we reverse the circuit court's award of attorney fees to Bank.

WUEST, C.J., MORGAN and MILLER, JJ., concur.

SABERS, J., concurs in part and dissents in part.

SABERS, Justice (concurring in part and dissenting in part).

I agree with the majority opinion in all respects except as to Issue 3. Many aspects of this matter, especially the delays, were commercially unreasonable under SDCL 57A–9–504(3). Every aspect of the disposition must be commercially reasonable, including the method, manner, time, place, terms, and notice. SDCL 57A–9–504(3). However, the delays were caused by the requests of the debtor Haberer for more time to redeem, find buyers, release possession, rent the building, etc. Even the failure to foresee the drastic drop in market value was caused by the Bank's granting of Haberer's request for more time. This excuses the delays as to Haberer, but not as to the Van Meters as guarantors. As stated by the majority, a creditor seeking a deficiency has the burden of proving the reasonableness of all aspects of the disposition. This burden must be met against *all* debtors and guarantors. This creditor met its burden as to Haberer but not as to Van Meters. Therefore, no deficiency judgment should be allowed against the Van Meters. SDCL 57A–9–504(3).

---

**8.** The phrase "and not prohibited by law" which appeared in § 9–504(1)(a) was deleted by 1978 Neb. Laws L.B. 600, § 2.

**9.** SDCL 15–17–8 is further support that the legislature did not specifically authorize awards of attorney fees in UCC cases.